If it may please the court, I'd like to hold back five minutes for rebuttal, if possible. Yes. Good afternoon, Your Honors. My name is James Hiller, and I'm with the law firm of Gordon-Reese, and I represent the National University of Health Sciences, and I'm extremely honored to be before you today. This is my first time before the Ninth Circuit, and I thank you for your opportunity and your generous and patient ear today. I think the parties have done a really nice job of briefing this out. I am prepared to present my argument to you in toto, but if there is an area that at any time that you want clarification on or want to focus on that you believe ferrets out an issue, by all means interrupt me or even begin with questions. With that said, I'll begin. We're here, we have three bases for our appeal, and each of them is very important because they are tied to the past as well as the future of how NUHS navigates itself in the area of accreditation. The district court ruling that came out of Phoenix, we are bound by it, and the federal courts have exclusive subject matter jurisdiction over all of accreditation actions that we may have with CCE, and we have a forum selection clause which places us right back in the same district court should we have a problem. So we feel that the lower court, district court, has erred in several ways. The first of which is that statutory and or common law due process, procedural due process, required CCE to provide us notice of deficiencies, accreditation deficiencies, and an opportunity to respond and to do so in writing. But the trick here is that it's before the adverse action is taken. Council, so the question that I have for you on this is looking at the CCE manual of policies, page 184 of the excerpts, the status of an accredited program remains unchanged until the period for filing an appeal has ended or until the appeal process has been concluded. Clearly, that means to me that you have the full opportunity to obtain the position of the accrediting agency in writing, to respond before your status actually changed, although not before you were notified that you could be put on probation. So why doesn't that give you the notice that you need and the process to which you're due? There's a few reasons, Your Honor, and that's a very good question because it gets at the heart of this. I see where you're coming from. There are two pieces here. First off, the CFR, 34 CFR 602.25, A through F, talks about what sort of procedural due process must be afforded to the institution in this context, in particular when you have an adverse action. And it is cited in full on page 7 of our initial opening brief. But if you look at this, it says that under subsection D, that for an adverse action, we must be provided a sufficient opportunity for a written response by the institution or program regarding any deficiencies identified by the agency to be considered by the agency within a timeframe determined by the agency and before the adverse action is taken. So the adverse action is taken, it's undisputed in this case, Your Honor, that it's taken on February 2nd, 2018. And the reason that's undisputed is that it's the only writing and the only communication of you are being sanctioned for probation. That is the very first time. When did you go on probation? That's a good question. The probation doesn't become final unless you exhaust appeal remedies. So that means you weren't on probation until you lost the appeal? Formally, no. We still had the right to dispute it. But we were being notified that we were going on probation on February 2nd, 2018. So we're being notified that that is the adverse, that's the first notice that they're taking the adverse action. And now we're allowed to appeal it if we want. But the CFR is clear, as well as CCE's own express written policy. If you look at policy 8, which is electronic record 203, they specifically say verbatim, and I will quote, CCE provides clearly delineated fair procedures and opportunities for programs to appeal adverse actions of, and I'll skip those that aren't relevant. But it says public sanctions, including probation, and show cause orders. So they use the term expressly that probation is an adverse accreditation action. So going back to the CFR, our notice is that we are going to have an opportunity to respond before they actually impose it. And, Your Honor, the second piece, because I still think your question might not be 100% answered, and here's how I'm going to answer the rest of it. If you look at the same section of the CFR, 60225F, you'll notice that in another section, it talks differently about our obligations on appeal. So these are two things. One is after the sanction's imposed, you're allowed to appeal it. The other is before it's imposed, you have an opportunity to respond. The reason, Your Honor, factually, we didn't have an opportunity to respond is because the very first time one iota of the word probation or deficiency is ever used or can be used based on CCE's policies is the February 2nd letter. CCE argues, and it's belabored in the brief, but that the site team provided us notice. But it is undisputed that the site team has no authority to identify deficiencies. The site team has no authority to identify compliance. The site team has no authority to identify noncompliance. The site team has no authority to do any enforcement. What the site team can do is list concerns. They can also list accolades, if they like, and they can also provide suggestions. But it's the counsel that has to review the site team report. So it's not intellectually or legally honest to say, as CCE does, that when we're at the site team level, that that's our opportunity to respond. We get to respond before they impose the sanction. So, counsel, going to the way where you started, if there are any areas where we have questions, although I've read your response to the motion to dismiss, why don't you tell me why you think at this juncture, this case isn't moot now that you're off probation? And I know you talk about capable of repetition, yet evading review. But, I mean, that would require a lot of contingencies years in the future for this to reoccur. And it's not clear to me why it would evade review. So explain to me why you think this case isn't moot at this point. There are two reasons. There is clear potential for this to happen again. Because of what we believe, Your Honor, is the error in the district court's ruling. The district court essentially adopted this position from CCE that at the site team level, that was a piece of our due process notice. Our due process notice that we were deficient. And, again, there was no authority for that. What the ruling has done is it's created the potential for this system to be weaponized against us, in that every time we sit down for a site team meeting, which is a part and parcel of everyday accreditation, site teams always have concerns. Some of them arise to being shortcomings. Some of them don't. But what we now have to do is, because it's been held at the district court level, that that was one of our opportunities to respond, that now we have to assume a advocate level and an adversarial level that there is a potential pending sanction of probation or other adverse accreditation action coming at that level. But doesn't every school know, no matter what the accreditation standards are, that there is always a potential for a sanction? Isn't that the very purpose of an accreditation review by an accrediting agency, that there could be something that the accreditation agency discovers that could possibly in the future lead to some sort of sanction? Well, sure. I think that's something that anyone would have to admit. The problem, Your Honor, is that what happened here is we are looking at a step that is required that was skipped in their own policies as they reconcile with the CFR. The district court's ruling can be read as precedent to say that's the interpretation of their policies, but they now get to skip that step always. What about, more specifically, the challenge to Policy 56? Why doesn't the change in Illinois law eliminate any prospective significance of that part of the case? We have experienced real irreparable harm, and that is in our verified complaint. The president of our university has attested to it, and it does go into some detail, Your Honor Miller, but it doesn't go as far as if there was a full hearing on it. And that is student loans are tied to the, as you know from taking the bar yourself, they're tied to accreditation and bar passage efficacy rates. They're tied to whether or not the school maintains accreditation. So what happened here is that we have experienced the harm of losing faculty, we've lost current students, and we've lost prospective students. And to say that that harm is just erased because it happened in the past and it should no longer happen in the future is fundamentally unfair. There was a wrong. Mr. Hill, how could this possibly be repeated? How can the harm that you claim as the application of 56 be repeated at any time in the future? That is true, Your Honor. It's four years since the Illinois policy has been changed. The harm of being hurt by counting non-takers of an exam as failures, we have sustained it. And on a future basis, know that they will not be able to count in that exact way. You are correct. Right. So there's no reason to have a declaratory judgment on it, and there's no reason for injunctive relief, correct? I mean, to the extent, are you saying, Your Honor, that it's a violation? I don't understand why it's not completely moot, anything dealing with policy 56. It cannot be repeated, and therefore you do not need injunctive relief. It cannot be repeated, and therefore you do not need any declaration of it. I would say that it cannot be repeated in this very specific fashion. If we assume that Illinois does not change its licensure requirements, if another state doesn't change its requirements, if everything stays the same, yes, it can't be repeated. But we don't know that. Illinois has moved their requirements before. But I would agree with you. If we're counting under policy 56 going forward, it should not occur again. Counselor, you're down to about two minutes. Would you like to reserve the remainder of your time? Yeah, I'd like to hold it back, Your Honor. All right. Okay. Mr. Cook, whenever you're ready. May it please the Court, and good afternoon. My name is Patrick Cook, and I represent the APALE, the Council on Chiropractic Education. I'd like to go back initially, Your Honors, to the question that was put regarding mootness. It is moot. The only relief sought in the complaint that was filed by NUHS related to injunctive relief and declaratory judgment relief, and Judge Murphy, you're quite correct, the four years is coming up now. This summer, it will have run its course. So they will be reporting the same four-year passage rates that every other DCP has been reporting since the implementation of policy 56. So this issue in this matter is largely moot. I do want to address what counsel was suggesting regarding adverse actions and the statute and the due process afforded under that statute. A number of terms have been conflated both in the briefs, and I just heard it here again today. First, the federal regulation, 60525, and the statute essentially say the same thing. The due process requires that the council afford, in this case NUHS or DCP, the opportunity to respond to written deficiencies, first to provide written specification of deficiencies, and then an opportunity to respond. The council did just that, not once but twice. First, with respect to its site team. This idea that the site team is some sort of rogue third party that was contracted out by the council with no relationship to CCE is just not accurate. The site team and the membership of the site team is appointed by the council. It is charged with a manual to go to and visit the DCPs and review the DCPs in their entirety, and then is charged with preparing a report for the council. The site team is the council's site team. It's not some independent separate organization that was submitting a report and then separately the DCP was submitting a report, and then the council was going to make some sort of decision or reach some conclusion. The site team is an extension of the council. It is its fact-finding extension and fact-finding team, something that actually was suggested maybe perhaps traditionally admitted by NUHS in its own briefs. So this idea that they didn't know about any deficiencies until they received a February 2, 2018 letter from the chair or president of the council is just not accurate. In November 2017, they received a final report that was sent to them by the council. The site team itself did not submit that report. The council sent it to NUHS and required of NUHS a response to be submitted within 30 days, which it did. In that report, it evaluated the entire program, making commendations and highlighting some of the positive aspects of NUHS's doctor of chiropractic degree program, and then also pointing out three deficiencies, section 2H, section 2A, and violations of policy 56. They were identified in that site team report as concerns, but concerns also was defined in the report as deficiencies, major to minor, reflecting inconsistencies or a lack of compliance with the council's standards or policies. The regulation referenced by council, both in the briefs and here today, as well as the federal statute, 20 U.S.C. section 1099, also says written specification of deficiencies, not conclusions, not sanctions or consequences, and that essentially is what NUHS is requesting of the court, that it should have had an opportunity to respond to the consequence of the deficiencies or perhaps an opportunity to respond to the penalty that was imposed in connection with the deficiencies. The statute doesn't say that. The regulation doesn't say that, and the standards don't provide for it. What they were provided in November 2017 were specifications of deficiencies as required under the statute and regulation and an opportunity to respond. Now, for the council, they actually require a response, and they did, and the NUHS provided it a month later. So they responded in writing as required under the regulation and the statute and their own standards. They responded in writing to the council's site team report. Again, not some independent third party, the council's site team report. And in it, they responded to each one of the deficiencies. An in-person meeting was held a short time later in January of 18, and then in February 2 of 2018, the council made its decision, one, reaffirming accreditation, and two, imposing the penalty of sanctions in order to require and requiring that NUHS bring itself into compliance with the standards and policies of CCE. This is what we was required to do, and it followed both the regulation and the statute that governs due process requirements. Adverse actions, and this is significant as well. We talk about adverse actions colloquially or in everyday parlance, but it's also a very defined term. Adverse action under the regulation and statute, as well as in the council's own standards, is defined. It's defined as the denial, withdrawal, revocation, or termination of accreditation. Those four things. That's what an adverse action is. That's what the statute and regulations speak to. That's how it's defined, actually, in CCE's own standards. A complete cessation of the relationship between the DCP on the one hand and the council on the other. If during the course of reaffirmation of accreditation, noncompliance actions are discovered, the council is obligated under its own standards to do one of two things. Immediately initiate an adverse action, which, again, is defined. That's in the record at 357. Defined as the denial, withdrawal, revocation, or termination of accreditation, or require that the DCP bring itself into compliance with its standards and policies. This is what they did. Now, with respect to the noncompliance actions available to the council to enforce, there are four. That's also identified in the record. One is to issue a warning. Another, impose sanctions. A third, issue a rule to show cause order. And the fourth, a denial or revocation of accreditation. Now, that fourth, the denial or revocation, would come up only if it proved that the DCP could not bring itself into compliance within the time period prescribed, which is 24 months, two years. They had two years to bring themselves into compliance. Anything beyond that leads to the adverse action. The other three noncompliance actions available to the council to enforce against a DCP when they are found to be noncompliant necessarily involves a DCP that's accredited or whose accreditation has been continued or reaffirmed. Warning, sanctions, or the issuance of a show cause order. I'd also point out that under accreditation actions in the standards, there are seven that are available to the council, and they may be imposed at any time. At any time means just that. That would include necessarily when a DCP is applying for reaffirmation of accreditation. NUHS begins its challenge and due process challenge in its briefs by suggesting that because they were undergoing reaffirmation and because there was a finding by the council of reaffirmation of accreditation, it necessarily could not also find that the DCP or NUHS was out of compliance or noncompliant with any of its standards or policies. That's just not accurate. Both can occur and did. NUHS suggests that it was fortuitous that its noncompliance was discovered while it was undergoing a reaffirmation with the council, that it was undergoing that process. It suggests that in reaffirmation of accreditation, that the council only had two choices to make. One, affirm and grant accreditation, or two, revoke it. Those were the only two options, according to NUHS, available to it. But that illogical, to use NUHS's words, conclusion finds no support in the standards or policies. That conclusion isn't supported in the statute of regulation either. Second, as far as the due process challenge, the NUHS goes on to argue that the statute of regulation affords it more. It doesn't. The council actually provided NUHS an opportunity to appeal its sanction of probation. That was more than what the statute of regulation referenced by council here today and in the briefs actually requires. Okay. Council, before you run out of time, I wonder if you could address a point that you didn't raise in the brief, but that is the question of what creates the cause of action here? We have a statute that provides substantive regulation of this area, but doesn't expressly create a private right of action. So what do you think is the basis for the cause of action? So I do believe, Judge Mueller, that you're right. There is no private cause of action with respect to matters under the statute of regulation or matters generally involving the Department of Education and accreditation. I do believe, however, though, that there is a common law due process that must be observed and afforded. And so the action lies in that, whether a due process was followed and provided to the members, in this case, of an accrediting agency. And you think that there is a – I mean, the due process, I understand the substantive due process, right, but the cause of action is a creation of federal common law, in your view? I believe so, Your Honor. For purposes of – as framed by NUHS, it's declaratory judgment, as well as its efforts to seek injunctive relief, based on this purported alleged deprivation of due process that is afforded both by the federal regulation and 20 U.S.C. Section 1099. And you – but you haven't challenged or you haven't raised the question of whether the recognition of such a cause of action is an appropriate exercise of the federal court's authority to create federal common law, have you? I have not, Your Honor. And while this is a new matter, a case of first impression, I believe, would be for this circuit. Other circuits have visited this issue in the context of, again, challenges to due process that was afforded by an accrediting agency to one of its members. Those issues were framed also in declaratory relief as well as injunctive relief, all premised on a deprivation of due process. Okay. Thank you. Of course. Finally, the Policy 56. It is something that has run its course. It is something that is moot. It is something that isn't going to come up again. But the arguments that were made as to why it somehow – it was somehow a deprivation of due process to – for the counsel to consider the noncompliance with Policy 56 while the NUHS was noncompliant is something I would like to address very briefly. First, they claim that requiring the reporting of all four parts was violative of Illinois public policy. It's not. The Illinois Supreme Court declared that violating public policy involves some sort of offense to the public good, something that contravenes morals or a public interest. Requiring the reporting of the passage rates of students on a Part 4 of the NBCE does not fit into that category in any respect. Second, they claim – NUHS claims – Mr. Cook, before you run out of time, can I go back to the due process question? I believe the Sixth Circuit was one of the courts that addressed that. Did any of the courts address the propriety of a federal common law due process here? Did any of them address the fact that it's almost like implying a private cause of action for somebody to pursue this common law due process claim? I don't believe that specifically, Judge Murphy. They have noted that there is no private cause of action under the education acts that are in play here. So that is quite correct, and Judge Miller was alluding to the same. The issue comes as to whether or not the accrediting agency has the right or ability to revoke or in any other way affect the accreditation status of one of its members and not have a court review it. There they have both the Sixth Circuit, I believe the Fourth Circuit, the Eleventh Circuit more recently, and the Seventh Circuit, have all considered these types of due process challenges to ensure that the members are afforded that which the legislature prescribed in 20 U.S.C. Section 1099, but also in the federal regulations, 34 CFR 602.25. Thank you, counsel. Thank you, Your Honor. All right, Mr. Hiller, we gave Mr. Cook a little bit of extra time. Why don't we put 20 minutes on the clock for your rebuttal, and whenever you're ready to start. Yes, Your Honor. I don't want to belabor the point, but I do think that there was on policy 56, there was and still is an ongoing reputational injury. I don't want to devote too much verbal real estate to this, but we are looking at there are 14 institutions that provide this degree. Counsel, are you aware of any case which says that the past reputational, the fact that a declaratory judgment in a case that can't reoccur, that it's not moot because that declaratory judgment could help remedy past reputational harm? Your Honor, the way you phrase it there, I'm not in the best spot to specifically answer that. I believe in response to the motion to dismiss on mootness, we cited a case or two. I don't recall, I apologize. It's not fresh in my mind if that involved reputational injury or not. But I believe the reputational injury is real and it's palpable. I want to address this notion because I don't think it really helps look at the due process issue. NUHS is not saying the site team was rogue. The site team did what they were supposed to do. What we are saying is CCE's own policies and procedures say that the site team has no authority to find that you have a deficiency, no authority to find that you're not meeting a standard. They have none whatsoever. So that cannot be notification of such a shortcoming. It just can't. And that's clear. From the record, page 328, it talks about the nature of their responsibility. I also wanted to address, I do think on the issues that you were asking my colleague, Mr. Cook, about a private cause of action. I do think that the Fourth Circuit does address this in the professional massage case. It's addressed as fundamental fairness in the Sixth Circuit, Cooley Law case, as well as fundamental fairness in the Eleventh Circuit. In that case, I believe it is Hiawathi. Well, I mean, I guess the reason for my question is the interest in fundamental fairness would be a good reason for Congress to create a cause of action. But it's not necessarily a basis on which we can create one when Congress has not. So given that it's – he hasn't raised it, so maybe it's not before us for that reason. But if we were to confront the question, why should we follow those other circuits on that point? This is a standard law that's been around for a while that accrediting agencies do rely on, and they do take notice of it. Also, there is a difference between substantive and procedural due process. And, you know, I don't think that it would be fundamentally fair to not even recognize it because it would leave due process from a procedural standpoint on a common law level, making it nonexistent, making it easy to railroad folks, making it easy to do exactly what happened here, to not provide notice and opportunity to respond. All right. Thank you, counsel. We thank both counsel for their helpful arguments, and this case will be submitted. The next case on the calendar is United States v. Ayala.
judges: Murphy, Bennett, Miller